CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY ET AL. *v.* SHROYER ET AL.

[No. 12,466. Filed June 17, 1927. Rehearing denied December 9, 1927. Transfer denied November 25, 1931.]

*Frank L. Littleton, Forrest Chenoweth, Orr & Clark* and *H. N. Quigley,* for appellants.

*Silverburg, Bracken & Gray,* for appellees.

MCMAHAN, J.—Action by Roscoe N. Shroyer and Vance G. Shoemaker against appellant railroad company and the Western Union Telegraph Company to quiet title to and to recover possession of certain real estate and for damages for an alleged trespass. The court found the facts specially, and stated conclusions of law in favor of the plaintiffs, hereafter referred to as "appellees." The errors assigned are that the court erred in each conclusion of law and in overruling appellants' motion for a new trial.

In order that the questions involved can be better understood, the following map showing the location of the land involved and the surroundings is made a part of this opinion.

The land in dispute, and which is claimed by appellants and by appellees, is a strip about eight or nine feet wide extending from Main Street in the town of Daleville northeasterly to a point beyond the coal shed as marked on the above map. The north part of the elevators, stock pen and coal sheds extends onto the land in dispute. Appellants contend the land in controversy is a part of the right of way of appellant railroad, while appellees contend otherwise.

The facts as found by the court are, in substance, as follows: On January 17, 1850, Justin Steel was the owner of a certain tract of land of which the land in dispute is a part; on said day the Indianapolis and Bellefontaine Railway Company obtained a judgment against Steel before a justice of the peace granting the railroad a right of way through the real estate owned by Steel, the width of such right of way not being specified in the proceedings or in the judgment; some time in 1850, the railway company constructed a line of railroad running from the northeast to the southwest across

the land owned by Steel and through the town of Daleville; said railroad and its successors, including appellant railroad, have maintained and operated a line of railroad across said land continuously since that time; as originally constructed through said town, the railroad consisted of one main track only; later, two side tracks were constructed, both being south of the main track; in September, 1856, Steel conveyed the land so owned by him to Walter Ketchum, subject to the right of way of the railroad; in May, 1860, Ketchum laid out and platted that part of said land lying south of the railroad, said plat being designated as "Ketchum's Addition to Daleville," the north line of lots one, two and three on the plat being the south line of the railroad right of way; in 1921, appellees, as remote grantees of Ketchum, became the owners of the north part of lots one, two and three in said subdivision, and are still the owners thereof; in 1871, the then owners built a grain elevator on the part of lots one and two now owned by appellees, and in 1880, an elevator was built on the part of lot three now owned by appellees; there are also stock pens and coal sheds on the lots owned by appellees; prior to the erection and construction of said elevators, stock pens and coal sheds, no part of the land upon which they were erected had ever been in the possession of, used, or occupied by appellant railroad company or any of its predecessors; these elevators, pens and sheds have never been moved, but remain where they were originally constructed, and they, including the land on which they are located, have been used and occupied by appellees and their predecessors in title ever since their erection in connection with the handling of grain, stock, coal, etc.; the appellees and their predecessors in title have been in the peaceable, quiet, exclusive, open, notorious, and uninterrupted possession of the part of lots one and two so conveyed to

them, including the elevator and other improvements thereon, under claim of right and adverse to all other persons and has been used by them in connection with their business, all of which facts were known to appellant railroad and its predecessors in title; from time to time since the railroad was originally constructed, and since the elevators and other improvements were built, the main track and the two side tracks of the railroad have been gradually moved to the south by operating companies, so that now the center line of each of said tracks is six feet or more south of the original location thereof.

In 1905 the railroad entered into a written contract with the Pierce Elevator Company, the then owner of the part of lot three now owned by appellees, whereby the elevator company agreed to and for six years thereafter did pay to the railroad company an annual rental of $1 for the use of a strip of ground about eight feet in width, north and south, and 50 feet long east and west along the north end of lot three upon which the elevator was located; there is no evidence that this agreement was ever recorded or that appellees ever had any notice of its existence; a similar agreement was made under which $1 per year was paid the railroad as rental for a strip along the north side of the stock pen and coal sheds; in 1912, the then owner of the north part of lot three conveyed the same to a remote grantor of appellees, the deed reciting that it was subject to the right of way of appellant railroad; prior to 1922, the telegraph and telephone lines of appellants and the poles supporting them were located along the north side of the railroad right of way, but, in that year, it was decided to move them to the south side of the right of way; in August of that year, appellants, without the consent of appellees and over their objections, entered upon the land claimed by appellees, and dug holes

thereon and placed three telegraph poles on the land in question and strung a large number of wires between said poles and across the real estate and immediately over and within two feet of the roofs of the elevators, which prevented appellees from raising the height of the elevator, and the poles so set interfere with the use of the elevators; appellants, before and at the time they so placed said poles and wires, knew they would interfere with appellees' use of their property. The court also found appellants unlawfully and without right entered upon the real estate so claimed by appellees and without right placed the poles and lines over the same, and have since that time unlawfully maintained them thereon; that there was a wanton aggression by each appellant in said matter and that appellees have been damaged $500 by reason of the placing of said poles and lines upon the real estate.

The court concluded, as a matter of law, that appellees were the owners of the real estate in question; that the claim asserted by appellants was adverse to appellees' claim and title, was a cloud thereon, was unfounded and without right; that appellees' title should be quieted; that there was a wanton aggression on the part of appellants, and that appellees are entitled to exemplary damages in the sum of $500.

Appellants, in discussing the contention that the court erred in the conclusions of law and in overruling their motion for a new trial, assume and say the court found, and that the evidence shows, that appellant railway company's predecessor in title condemned a right of way 80 feet wide through and across that part of the section of which the land in question forms a part. Appellants, however, are mistaken in this matter, as there is no finding as to the width of the right of way condemned, nor is there any evidence on that question. The Legislature, in 1848, passed an

act for the incorporation of the Indianapolis and Belle-fontaine Railroad Company (Local Laws 1848 p. 176). Section 12 of that act, among other things, provided that the board of directors of such company should have power "to enter upon and take possession of any land necessary for the construction" of the road. Section 18 provided that the company might, before or after the location of any section of the road, obtain from the person through whose land the same passed a relin-quishment of "so much of the land as may be necessary for the construction or location of said road," and §19 provided that, if the owner should refuse such relin-quishment, the company could give notice to a disinter-ested justice of the peace of the county, whereupon the justice should cause the landowner to be summoned to appear on a named day, and provided that the jus-tice should summons a jury to assess the damages, whereupon the justice should render judgment, unless for a good cause shown to the contrary. Right to ap-peal to the circuit court was given. Section 21 pro-vided that, when the company procured the right of way as provided by the statute, it should be seized in fee simple of the right to such land. The condemna-tion proceeding was had under this statute. The stat-ute makes no provision as to the width of the right of way that may be condemned, other than to give the com-pany the right to condemn "so much of the land as may be necessary for the construction or location of the road." Since the condemnation proceeding did not pur-port to appropriate a right of way of any specific width, we hold the width of the original right of way must be limited to the width of the land actually taken and occu-pied by the railroad at that time. There being no find-ing that any part of the land in question was ever a part of or included in the right of way of appellant

railroad or any of its predecessors in title, or that either of them ever appropriated or used any part of it for railroad purposes, it follows, from the facts found, that appellants have no valid right or claim to any part of the land in question. It is conceded that the north line of appellees' land is the south line of the railroad's right of way. Since no part of the land in question has ever been taken or appropriated for railroad purposes, and appellants having no title to any part of such land, the court did not err in its conclusions of law.

Referring to the agreements wherein one of the former owners of the land on which the stock pens, the east elevator, and the coal sheds are located leased such land from the railroad company, appellants insist that the then owners of such land recognized and acknowledged that the railroad was the owner of the land described in the lease. It is to be observed that these leases were not recorded, and there is no finding that appellees had any knowledge of the existence of them. Nor is there any finding that the railroad was in possession of any part of the land when appellees purchased that part of the land described in the leases.

Appellants next contend the court erred in overruling their motion for a new trial, and, in support of this contention, say the decision is not sustained by sufficient evidence. This contention is also based upon the assumption that the evidence shows that appellant railroad company's predecessor in title condemned and had an 80-foot right of way at the point in question. We have searched the record and have not been able to find any evidence to sustain this contention. There is evidence from which it might be inferred that the present right of way, both east and west of the land in dispute, is 80 feet wide, but the evidence without dis-

pute shows that neither the appellant railroad nor any of its predecessors ever owned or occupied an 80-foot right of way along the north line of lots one, two and three as located on the map heretofore set out. When Ketchum's Addition to Daleville was platted in 1860, the north boundary line of lots one, two and three was shown to be the south boundary line of the railroad right of way as then located. Robert Laboyteaux, 80 years old, testified that he had lived at Daleville since 1865; when he first moved to Daleville, the railroad consisted of the main track and one side track; he and his father ran a cooper shop; this shop was located north of where the west elevator is now located; this shop was between the ground occupied by this elevator and the first side track south of the main track and on ground now occupied by the second or south sidetrack; the west elevator is built partly on the ground where the cooper shop stood; a fence ran east and west along the south side of the railroad and extended east 60 to 80 rods to what the witness designated as "Ketchum crossing"; this fence was close to the first switch, as then located; the third track was not built until after 1871; that fence was located north of the present warehouse. John Redmond, 71 years old, and who had lived in that neighborhood all his life, testified concerning the old cooper shop. He also testified that a fence ran parallel with the railroad, along the right of way to the corner of the west elevator; that fence was there as late as 1873. The evidence is ample to sustain a finding that, as early as 1865, and as late as 1875, there was a fence along the south side of the railroad as then located and that this fence extended east to a point beyond the east elevator and coal shed and was north of the land in controversy. There is no evidence to sustain appellants' contention that they have an 80-foot right of way at the point in

question, but it is amply sufficient to sustain a finding that appellees are the owners in fee of the land in controversy.

Judgment affirmed.

Dausman, J., absent.